Filed 10/10/22  P. v. Parrish CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C091435 |
| Plaintiff and Respondent, | (Super. Ct. No. 19CF01537) |
| v. | |
| JEFFREY CRAIG PARRISH, JR., | |
| Defendant and Appellant. | |

Lorenzo Paz II was found in his home dead from a gunshot wound to the head.[1] In multiple statements on Facebook and elsewhere, defendant Jeffrey Craig Parrish, Jr., bragged about Lorenzo's death, complaining that Lorenzo had cut defendant out of the proceeds of drug deals and entered into a relationship with defendant's ex-girlfriend.  A jury found defendant guilty of first degree murder (Pen. Code, § 187) but rejected a

---

[1] To avoid confusion, we refer to the victim and his sister Melissa Paz, a witness at trial, by their first names.

1

handgun use allegation (Pen. Code, §§ 12022.5, 12022.53, subds. (b)-(d)) and a charge of possession of firearm by a felon (Pen. Code, § 29805, subd. (a)). The trial court sentenced defendant to 25 years to life in state prison.

On appeal, defendant contends the trial court erred: (1) in admitting expert testimony and other evidence regarding defendant's alignment with members of a white supremacist gang; and (2) in refusing to sanction the sheriff's office when recordings of 30 witness interviews were recorded over and lost.[2]

We find no prejudicial error and affirm the judgment.

## FACTUAL BACKGROUND

On the evening of October 20, 2017, Lorenzo went next door to his sister Melissa's house and left his dog for her to watch while he went out. At about 9:00 p.m., Melissa sent Lorenzo a message through Facebook, which was marked read, but she received no response.

At about 1:30 to 2:00 a.m. on October 21, Melissa heard a car park in front of Lorenzo's house. The car stayed a few minutes, and then backed out and drove away in the opposite direction. When Melissa woke up that morning, Lorenzo's dog was still at her home.

Melissa went next door to check on Lorenzo. Lorenzo was on the couch, his face covered in blood. He was not breathing. She called 911.

Lorenzo had two cell phones and an iPad. Both were missing.

Butte County Sheriff's Office investigators responded to the scene at about 11:00 a.m. on October 21, 2017. Detectives James Beller and William Brewton were assigned to the case. There were no signs of a struggle. Lorenzo had a bullet wound on

---

[2] We address these issues as they arose in the proceedings below, not in the order presented by defendant on appeal.

his forehead and a cigarette lying on his upper chest.  A blanket covered his legs up to his thighs.  Beller concluded that Lorenzo was shot where he sat.

Investigators discovered a nine-millimeter shell casing behind the couch and a nine-millimeter round from a cushion behind Lorenzo's head.  An autopsy determined that Lorenzo was shot from one and a half to three feet away.

Drug paraphernalia, ammunition, and a baggy containing crystal methamphetamine were on the table in front of the couch.  A backpack next to Lorenzo on the couch contained baggies of heroin and marijuana and some loose ammunition.  A box of ammunition was on the ground next to the doorway to the dining room.  There was more ammunition and another bag of methamphetamine on the television stand.  Lorenzo had methamphetamine in his system at the time of his death.

Defendant and Lorenzo formerly were friends and used to deal drugs together.  The summer before the murder, defendant visited Lorenzo on multiple occasions.

Towards the end of October 2017, Lorenzo brought Melissa over to his house to show her lightning bolts that had been painted on the side of his house.  Lorenzo seemed upset by this.

Sometime after Lorenzo's death, Melissa obtained a recording of a phone call between defendant and Rebecca Price, defendant's ex-girlfriend with whom he had a child.  Melissa gave the recording to investigators.  Defendant had called Price 15 minutes after she messaged him on Facebook asking, "Hey, did you shoot someone named Lorenzo Paz?"  In the recording, defendant said that Lorenzo was shot in the "dome piece," referring to the head.  In response to Price's question as to who did it, defendant said he was not going to give up a name.  Defendant tried to find out who it was that had contacted Price about defendant shooting Lorenzo.  Price responded that she could not tell defendant who told her.

Upon receiving this recording, detectives focused on defendant as a suspect in Lorenzo's killing. Detectives obtained records from defendant's Facebook account that included messages with various individuals containing references to Lorenzo's murder.

Detective Brewton testified to messages from defendant's Facebook account. On October 27, 2017, defendant messaged Matty Roy: "Was up playa, did you hear about the good news recently, LMAO [laughing my ass off]. This lame Zo, aka Lorenzo Paz, got a special knock on the door, and pow, got blasted right in the dome." On October 28, 2017, when Roy sent a photo of his face after suffering a beating and named the person who did it, defendant wrote: "I'll see what's up. He needs to get got to like Lorenzo." Also on October 28, defendant messaged Roy: "Love you, too, man, and still on the news. The cops have no idea who shot that kid. Ha ha ha."

On November 20, 2017, in a message to defendant, Dane Fraley discussed his struggles, and defendant responded, "I've had my own recent thing happen," followed by a screenshot of a press release about Lorenzo's murder, with the following explanation: "That's the fool that was chilling with my ex. The same fool who was once my homey. I put him on, and then when I was in Reno he was chilling with her, making side deals I never seen a cent for. And after I got released, me and that kid were talking on facebook, had a bad saying of words, and I told him 'I'm coming for my fucking money.' He said 'bring it.' And then I promised him he would get got. Two days later, bam, this was on the news. The only catch is that I was there that Saturday. I came there with Brett [Dunaway]. Brett never came to the house or nada, but I had my boy pay that kid a visit at 2:37 a.m. Ironically cops found the kid dead at 10:30 a.m. same day shot in the head."[3]

---

[3] As Butte County Sheriff's Office Captain Daryl Hovey testified, the Butte County Gangsters, a white supremacist gang in Butte County, uses the number 237 to refer to the letters BCG as code for the gang. We will discuss the remainder of Hovey's testimony

4

On November 21, 2017, defendant messaged Jennifer Graves a photograph of a sizable amount of heroin and another photograph of handguns, rifles, and ammunition with the comment: "What we got from Lorenzo's house after he was killed. My boy ran up in there and took it all." In a further exchange of messages, defendant wrote: "That kid died with a cig in his hand," and "I'll never forget his expression when he answered the door that early morning."

On March 3, 2018, defendant messaged Tony Bartley about someone who they did not identify in the conversation. Defendant messaged: "He can end up just like Lorenzo, for all I give a fuck. And he's got kids, so I'll target them first."

Defendant had a number of message exchanges with Faylene Jarmen. On October 25, 2017, Jarmen messaged defendant a screenshot of an article about the murder and he responded, "I've known that already, though I'm just wondering if my ex is going to start running her mouth with my name." By "ex," defendant meant Kayla Hudgens. Hudgens had been in relationship with defendant in Reno and then with Lorenzo in Oroville. Defendant shared the screenshot with Tony Kirkpatrick and said, "Ironically my homey she [Hudgens] fucked with behind my back that made side deals and I never seen a cent of it, got taken care of a week after I got out and two days after I said, 'don't trip homey, I'll be seeing your LOL.' Now she's scared for her safety, she's been saying to people." Defendant followed this message with another: "But I'll finish what I started bro. She [Hudgens] came to testify against me. I can't let that slide, just like I couldn't let Lorenzo slide."

On November 20, 2017, defendant sent Jarmen a message about her brother, "LOL. Tell him that I had some words with Lorenzo Paz and now he's dead. It was on the news." Defendant continued, "Tell him don't worry, and you won't end up like

---

and other gang evidence in our analysis of defendant's claim that this evidence was wrongly admitted.

5

Lorenzo Paz." When Jarmen messaged defendant that she was talking to Hudgens, defendant responded: "Don't forget to mention me and what happened to Lorenzo Paz. Haha." He continued, "Tell her, J.J. sends his just like he did to Lorenzo. Hashtag Fact. Tell her just like that." Defendant then messaged: "Haha, I already know damn well what happened. Haha. I should know, I was the one that knocked on the door when he answered. Shocked look and cigarette in hand. He died still holding that cigarette."

On February 23, 2018, defendant messaged Jarmen multiple times: (1) "Junky whore will be no more but my damn name's coming up more and more about involvement about Lorenzo straight up." She responded, "Serious. It's because you were in the Ville [Oroville] that weekend"; (2) defendant responded, "I know," "Even my baby mama knows, and not a word is on the street. They've been rounding up people that all knew me and building a case." "But so far six others now know. I'm not playing, this shit's got me concerned. . . . I still got the kid's jacket with splatter on it," and Jarmen responded, "Burn that shit"; (3) "I don't know why, but not a single bit of remorse is a fiber of feeling in my body. I was just tripped out that the backlash from the shot of his head hit my face and new white shirt"; (4) "I'm probably fucked. I don't know," and she responded, "You're not fucked unless you left fingerprints. I know you're not that stupid"; and (5) in an exchange with Jarmen where defendant messaged that he had "found out that there was a third cell phone, so I bought it and checked to see who's left on the list that may be snitching," she told him to burn the phone and "the jacket" and "all the clothes you were wearing, shoes, too," and defendant responded, "I will tonight."

Elisha Watkins testified she knew defendant for a long time and Lorenzo for about a year. She was at Lorenzo's house the week before he was murdered. He pointed out racist, Nazi gang signs on his house "like the lightning bolts or something." Lorenzo said someone was trying to send him a message. On October 21, 2017, in late afternoon, defendant and a friend picked Watkins up and they went to the friend's house. Defendant was "shook up." Defendant told her he was involved in Lorenzo's death, that he "was the

6

one that had done it." Watkins testified that defendant said "he had gone over to Lorenzo's house," and "as soon as he had opened the door, he had pointed the gun and he had shot him," and "when he shot him, something was in his hand as he died," and "when the cops found him . . . that thing was still there."

Danielle Acker testified that she knew defendant and Lorenzo, and both sold drugs for a living. In December 2017, between Christmas and New Year's, Acker ran into defendant at a casino in Oroville. She went up to defendant's hotel room. The two smoked marijuana and had sex. Afterwards, defendant disclosed that he was involved in Lorenzo's death. Defendant said he had given someone "a sack" and had him shoot Lorenzo, because Lorenzo was selling pills for Hudgens and not giving defendant a cut of the money. Defendant said he wrote Lorenzo on Facebook that he was going to come over to Lorenzo's place, and when they went there, defendant knocked on the door, Lorenzo opened it and smiled, and defendant "had the guy shoot him." Afterwards, they deleted the messages on Facebook.[4] Defendant said Lorenzo was holding a cigarette. Unnerved, Acker tried to leave several times, but defendant stopped her. Finally, at sunrise, they left, and she drove defendant to his parents' house. As they were leaving, defendant grabbed Acker by the hair and told her not to say anything, that no one would believe her.

Defendant testified in his defense. He denied any involvement in the killing of Lorenzo or ever communicating with Lorenzo on Facebook or otherwise. Defendant learned about Lorenzo's death from a press release, and that Lorenzo died with a cigarette in his hand from friends. Defendant denied being a drug dealer. He portrayed

---

[4] The return on a search warrant served on Facebook did not include any communications between defendant and Lorenzo on the site from July 2017 to the day he died. Facebook could not provide messages deleted prior to January 2018 when police contacted the company.

7

himself as a pimp and drug dealer "to be cool" and to have that image when he went to parties to "meet girls and all that type of thing."  The Facebook messages about Lorenzo were just defendant "talking crap" because he was "high" and "bored."

Defendant testified that in July 2017, he moved from Oroville to Reno.  Defendant was in jail in Reno when he met Brett Dunaway.  When defendant got out, he lived with Dunaway and Dunaway's wife in Reno and was still living there in October 2017.  Defendant had no car or phone; he used Dunaway's phone.  On October 20, 2017, defendant spent the day with Dunaway at one of the Reno casinos.  On October 21, 2017, defendant went with Dunaway to Oroville to see his parents and pick up drugs.  He was with Dunaway the whole time.

Defendant denied talking to Watkins on October 21.  He denied saying anything about Lorenzo to Acker or grabbing Acker's hair and telling her not to tell anyone.  Defendant testified he called Price to find out why she was asking if had killed Lorenzo.  He was high on methamphetamine, which made him talkative, and he talked about threatening Lorenzo "to look cool."

Dunaway testified that he met defendant in jail in Reno and defendant lived with Dunaway after defendant was released.  Defendant did not have a car or phone and he usually used Dunaway's phone.  Dunaway testified that defendant spent the day at his house on October 20, 2017, and they did not leave for Oroville until the afternoon of October 21 to pick up methamphetamine, which they were unsuccessful in getting.  They picked up a friend of defendant's and went to two casinos, spending an hour or two at each one.  Defendant was with Dunaway the whole time, except for 15 or 20 minutes at one casino when defendant went to get a drink.  Eventually, they went back to defendant's parents' house, where they stayed until early the following morning and departed for Reno.  Dunaway testified that in his opinion, defendant tells big stories and "expands on the truth."

8

Dunaway owned a GMC truck with OnStar GPS tracking. OnStar records showed the truck in Reno on October 20, 2017, and that the truck did not come to California until about 2:00 p.m. the next day. The truck left Oroville at 1:11 a.m. and returned to Reno by 4:15 a.m. on October 22. Dunaway's cell phone records showed calls connected in Reno and Carson City on October 20 and no calls connected in California until 1:46 p.m. the next day in Truckee and 4:00 p.m. in Oroville.

Defendant's parents testified that defendant and Dunaway visited one evening in October 2017, but they could not recall for certain if it was October 21st. Defendant's mother testified that defendant told stories that "[e]laborate outrageously." Defendant's father called defendant a "bullshitter."

## DISCUSSION

### I

*Lost Video Recordings of Witness Interviews*

Prior to trial, some 30 out of 50 video recordings of witness interviews by investigators from the Butte County Sheriff's Office were lost when the device storing them automatically overwrote old recordings with new recordings when the device was at full capacity. Relying on *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*), defendant contends the trial court erred in refusing to impose sanctions. The People argue this claim fails because defendant has not demonstrated that the recordings were exculpatory or that comparable evidence could not be obtained by reinterviewing witnesses.

### A. Background

Defendant filed a motion seeking sanctions for the destruction of video recordings of witness interviews. The prosecution filed an opposition, and defendant filed a supplemental brief. The court conducted a hearing on the motion.

At the hearing, Detective Brewton testified that forensic evidence found in the house did not point to any particular suspect and there were no percipient witnesses who

9

were in the house. Lorenzo's body was found on October 21, 2017, but defendant did not become a suspect until January 2018, when Lorenzo's sister provided detectives with a recording of a phone call in which defendant implied he killed Lorenzo in a dispute over drug proceeds. Defendant was arrested in March 2019. Detectives had interviewed about 50 witnesses by the time of defendant's arrest.

It is standard procedure at the sheriff's office to make audio or video recordings of witness interviews. Detectives take minimal notes focusing on the witness's demeanor and responses. Detectives then review the recording and write a report for the district attorney. A report might be written days, weeks or months after the recorded interview.

After defendant was charged, Detective Brewton discovered that the digital device on which the recordings were stored had reached full capacity and overwritten about 30 of the 50 recordings. Brewton made reports of the lost recordings based on recollection and notes.

The list of witnesses whose recorded interviews were lost included many from early in the investigation who had no information to offer. All of these witnesses were still available for interview, except for one who had died. That witness was in custody at the time of the murder and when interviewed, did not provide information that was either inculpatory or exculpatory.

Detective Brewton learned after an interview that one witness, Aaron Rex, had threatened to kill Lorenzo if he did not pay a $1,500 debt, but Brewton did not have this information at the time of the interview.

Detective Jason Miller testified that he supervised computer and cell phone forensics for the sheriff's office. At one point, Miller oversaw acquisition of electronic data storage drives. The vendor did not explain that factory settings for these devices were set to automatically overwrite data when reaching full storage capacity. The setting had to be changed manually. He first learned of this limitation when interview

recordings in this case were lost. The office has since changed the setting and purchased extra disk space.

After hearing argument from each counsel, the court ruled that the defendant had failed to establish that the prosecution (through the Butte County Sheriff's Office) acted in bad faith by destroying or failing to preserve the witness's recordings.

"Since the Court has found that the prosecution did not act in bad faith, the defendant is entitled to relief only on the showing that the destroyed evidence was material and exculpatory. Material and exculpatory evidence is evidence that might be expected to play a significant role in the defendant's defense. It must possess an exculpatory value that was apparent before the evidence was destroyed and be of a nature that the defendant would be unable to obtain comparable evidence by other available means.

"Having listened to the testimony of Detective Brewton and Detective Miller, the Court finds that the destroyed evidence did not possess any apparent exculpatory value before its destruction. The Court finds further that the destroyed recordings are not of such nature that the defendant would be unable to obtain comparable evidence by other available means since the witnesses who were interviewed can presumably still be interviewed.

"For the foregoing reasons, the defendant's motion to dismiss or in the alternative for sanctions is denied."

### B. Analysis

"We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard." (*People v. Fultz* (2021) 69 Cal.App.5th 395, 424.) Applying this standard, we conclude that the trial court did not err.

" ' "Due process does not impose upon law enforcement 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " [Citation.] At most, the state's

11

obligation to preserve evidence extends to "evidence that might be expected to play a significant role in the suspect's defense." ' [Citation.]  Whether the loss of evidence rises to the level of a due process violation is governed by the principles set forth by the United States Supreme Court in *Trombetta* and *Youngblood*.  [Citation.]  Under *Trombetta*, law enforcement agencies must preserve evidence only if the evidence possesses exculpatory value that was apparent before it was destroyed and if the evidence is of a type not obtainable by other reasonably available means.  [Citations.]  As an alternative to establishing the apparent exculpatory value of the lost evidence, *Youngblood* provides that a defendant may show that ' " 'potentially useful' " ' evidence was destroyed as a result of bad faith.  [Citations.]" (*People v. Fultz, supra*, 69 Cal.App.5th at pp. 424-425, fn. omitted, citing *Trombetta, supra*, 467 U.S. at pp. 488-489 & *Youngblood, supra*, 488 U.S. at p. 58.)

Defendant does not dispute the trial court's finding that the loss of the interview recordings did not involve bad faith on the part of the Butte County Sheriff's Office.  Therefore, as defendant acknowledges, he must show that there is no substantial evidence supporting the trial court's finding that the lost recordings did not constitute apparently exculpatory evidence and that comparable evidence could be obtained by reasonably available means.

Defendant argues that the exculpatory value of the lost recordings was apparent, "[s]ince the destroyed recordings included about 30 such witnesses, many of whom supplied no useful information while [defendant] was not even a suspect, the clear implication is that whatever they knew about the killing of [Lorenzo] did not include [defendant]."  Defendant argues this fact alone provides an inference of exculpatory value.  However, this amounts to speculation about what the recordings did or did not contain, which courts have rejected as a basis for a *Trombetta/Youngblood* motion.  (See *People v. Thomas* (2012) 54 Cal.4th 908, 929; see also *People v. Alexander* (2010) 49 Cal.4th 846, 878-879; *People v. Cook* (2007) 40 Cal.4th 1334, 1349; *People v. Fauber*

12

(1992) 2 Cal.4th 792, 829 [" '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense' "]; *People v. Velasco* (2011) 194 Cal.App.4th 1258, 1265-1266; *People v. Lopez* (1987) 197 Cal.App.3d 93, 97.)

Defendant further asserts that "some of those witnesses did provide information which would cast suspicion on someone other than [defendant], with one such witness identifying a person who had a motive to kill [Lorenzo]." By this argument, defendant establishes that the lost evidence could be obtained by other reasonably available means. The name of this witness, Aaron Rex, was provided to defendant. Rex could have been reinterviewed or called as a witness and examined at trial.[5] (See *People v. Fauber, supra*, 2 Cal.4th at p. 830 [comparable evidence of unrecorded interview was available through testimony of interviewee].) Indeed, the sheriff's office compiled a list of all the witnesses whose recorded interviews were lost. (See *People v. Cook* (2006) 39 Cal.4th 566, 591-592 [no *Trombetta* error when photographs of occupants of house where crime occurred were lost because police made a list of the occupants].) Moreover, defendant does not dispute Detective Brewton's testimony that evidence that Rex threatened Lorenzo was not known to Brewton at the time of his interview of Rex, so the interview recording had no apparent exculpatory value at the time it was made. Accordingly, defendant has failed to show there was insufficient evidence to support the trial court's finding that comparable evidence could be obtained by reasonably available means. As such, defendant has failed to show that there was insufficient evidence to support the trial court's denial of defendant's *Trombetta/Youngblood* motion.

---

[5]  A stipulation by the parties was read to the jury to the effect that Watkins delivered a message to Lorenzo from Rex stating that Rex would kill Lorenzo if he did not pay the money he owed Rex.

13

## II

### *Admission of Gang Evidence*

Defendant contends that it was prejudicial error to admit evidence that created an "aura" that Lorenzo's murder was gang related. We agree that the trial court erred in admitting gang evidence but conclude the error was harmless.

### *A. Background*

Defendant moved in limine to exclude testimony by Sheriff Captain Daryl Hovey, a gang expert, that lightning bolts are associated with the Butte County Gangsters and aligning oneself with the gang by painting lightning bolts brings street credibility and status.

Defense counsel argued the evidence was an attempt to paint defendant as a gang member, even though there was no solid evidence that defendant was responsible for the lightning bolts and there were no gang allegations against defendant. The prosecutor maintained the evidence went to motive; that defendant was trying to align himself with the Butte County Gangsters to frighten Lorenzo and elevate defendant's status on the street. The prosecutor agreed that defendant was not a gang member but noted that defendant's postings on social media showed him posing with gang members and one of defendant's Facebook messages used the numbers 237, which stand for the letters BCG. The court said it was leaning towards precluding the evidence under Evidence Code section 352 but the number 237 reference could be significant. The court deferred the matter to an Evidence Code section 402 hearing.

At the hearing, Captain Hovey testified the Butte County Gangsters is a white supremacist gang in Butte County. The gang identifies itself by tattoos and symbols including lightning bolts and the number 237. Hovey identified gang members and former gang members in photos with defendant. In one photo, defendant was displaying a hand sign of a "W," which, for white supremacists, stands for white, or devil horns,

14

which stands for gang life. Hovey conceded that the "W" symbol was not quite right and might be Texas Longhorn "[h]ook'em" horns.

Defense counsel objected to the gang evidence on the basis that there were no gang allegations, no evidence the murder was gang related, and no evidence that defendant was a member of a gang. He argued that the evidence should be excluded under Evidence Code section 352, given the lack of relevance of this evidence in proving who shot Lorenzo and the undue prejudice of injecting a gang theme in the trial. The prosecutor countered that the lightning bolts on Lorenzo's house were evidence of gang involvement. She noted that defendant posted photos of himself with gang members, talked of Lorenzo being killed at 2:37 a.m., and posted a photo of himself with an individual who defendant described as an " 'original part of the founders of the Butte County Gangsters, 237.' "

The court found that the photos of defendant with gang members and Captain Hovey's testimony were relevant as to motive. The court also found that the probative value of Hovey's testimony exceeded its prejudicial effect.

Captain Hovey thereafter testified consistent with the hearing, including that the Butte County Gangsters is a white supremacist gang in Butte County that uses the numbers 237 representing the letters BCG and lightning bolts as symbols. He identified defendant in two photos, one with a former gang member and one with a gang associate, in which defendant was making a "W" sign with his hands that stands for "white." Hovey also identified photos taken from defendant's Facebook account depicting current and former Butte County Gang members, including Matty Roy with whom defendant exchanged messages on Facebook referring to Lorenzo's murder. Hovey explained that white supremacists use Nazi symbols because "several espouse to the White Aryan race, or the eli[te] race, similar to what Hitler thought was the ideal for the world in World War II." On cross-examination, defense counsel again elicited testimony that one hand sign looked like the "hook'em sign" of the Texas Longhorns football team. Hovey also

15

testified that the number 237 used in a social media post could be used to determine gang membership or status, but he agreed that it could also describe the time of day, depending on the context.

In closing argument, the prosecutor explained defendant's motive to murder Lorenzo to the jury. Defendant and Lorenzo "were fellow drug dealers and pimps" and defendant "didn't get a cut of Lorenzo's business that he felt he deserved." Defendant "felt he had to address this disrespect. He told people he killed Lorenzo for this reason. And he must make sure that people know that he's the killer to get credit, to create the fear and respect he needs to continue his businesses." Also, "[t]here was jealousy over Kayla [Hudgens]," whom defendant had dated. Hudgens was selling drugs and not giving him part of the proceeds.

Then, the prosecutor shifted to presentation of a photo of defendant holding up three fingers, which Captain Hovey testified "could be a benign meaning, or it could be a meaning that's appropriate to the White Supremacist group," because defendant wanted to be linked to the Butte County Gangsters "to gain fear and respect," reminding the jury that "the victim found lightening [*sic*] bolts on his house a few days before the homicide" as "a message to him." The prosecutor showed the jury another photo of defendant with a gang member who was "[t]hrowing a hand sign for white." Finally, the prosecutor showed the jury a Facebook message string that referenced the time of the murder as "2:37 a.m.," even though it probably took place earlier, because "2:37 [*sic*] means something to Butte County Gangsters, and it means something to people who understand who the Butte County Gangsters are."

### B. Analysis

Defendant contends the trial court erred in admitting gang-related evidence, which was improper character evidence (Evid. Code, § 1101) and unduly prejudicial (Evid. Code, § 352). We review the trial court's admission of gang-related evidence for abuse of discretion. (See *People v. Flores* (2020) 9 Cal.5th 371, 397; *People v. Coneal* (2019)

16

41 Cal.App.5th 951, 964; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.)

"Trial courts must 'carefully scrutinize' gang-related testimony before admitting it into evidence, because the content of such testimony 'may have a highly inflammatory impact on the jury.' " (*People v. Flores, supra*, 9 Cal.5th at p. 402, quoting *People v. Williams* (1997) 16 Cal.4th 153, 193.) " '[G]ang-related evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition" and . . . such evidence should therefore "be carefully scrutinized by trial courts." ' " (*People v. Huynh* (2021) 65 Cal.App.5th 969, 980 (*Huynh*).) "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see *Flores, supra*, at p. 402 ["The risk of injecting undue prejudice is particularly high in cases where the prosecution has not charged a gang enhancement and the probative value of the gang evidence is minimal"].)

" ' "Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.]" ' [Citation.] ' "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" ' [Citation.] Common gang motives include 'criminal activity against a rival [citation] or a suspected rival [citation]; a battle over gang territory [citations]; retaliation for a prior attack upon a gang member [citation]; intimidation preceded by gang signs and identification [citation]; or bolstering one's reputation within the gang [citation].' " (*Huynh, supra*, 65 Cal.App.5th at pp. 980-981, quoting *People v. Memory* (2010) 182 Cal.App.4th 835, 858-859 (*Memory*).)

"Gang evidence is inadmissible if introduced only to ' " 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.]" ' " (*Huynh, supra*, 65 Cal.App.5th at p. 981; see also *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449

17

["Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense"].)

Applying these principles, we conclude the trial erred in admitting gang-related evidence in this case. The prosecutor conceded that defendant was not a gang member and stated that the prosecution was not trying to paint him as a gang member. The evidence that the murder was related to the Butte County Gangsters consisted of the lightning bolts painted on the side of his house before the murder and defendant's reference to 2:37 a.m. as the time of the murder. However, there was no evidence that defendant was responsible for the lightning bolts. In fact, there was no evidence at all, as to who painted the lightning bolts on Lorenzo's house. To the extent that reference to the number 237 suggested that a gang member committed the murder with defendant or at his behest, this was mere speculation. The prosecution never attempted to advance a theory that a member or associate of the Butte County Gangsters participated directly or indirectly in Lorenzo's murder. On the other hand, evidence showing defendant photographed with gang members, throwing gang signs and praising gang members allowed " '*unreasonable* inferences to be made by the trier of fact that . . . [defendant] was guilty of the offense on the theory of "guilt by association." ' " (*Memory, supra*, 182 Cal.App.4th at p. 859.)

The prosecution offered this evidence and the trial court admitted it ostensibly to show motive, but the motives under which gang evidence has been held relevant and admissible, as outlined by this court in *Memory, supra*, 182 Cal.App.4th at page 859, are not present in this case. On appeal, the People argue "the evidence was relevant because it was one part of proving [defendant's] motive to preserve his standing as a dealer."

Yet, as the prosecutor told the jury, Lorenzo, defendant's former fellow drug dealer, was selling drugs without giving defendant a cut that defendant believed he deserved, and, to boot, was conducting this business with Hudgens, defendant's former

18

girlfriend, who had moved on to a relationship with Lorenzo. Thus, defendant "felt he had to address this disrespect," and did so by killing Lorenzo and letting people know that he did. This was clearly defendant's motive for the murder, and it did not implicate his involvement with the Butte County Gangsters.

That said, we find the admission of the gang evidence in this case to be harmless. Defendant acknowledges that prejudice from errors in admission of gang-related evidence are usually assessed under *People v. Watson* (1956) 46 Cal.2d 818, 836, i.e., whether it is reasonably probable that the result would have been more favorable to the defendant in the absence of gang evidence. (See *Memory, supra*, 182 Cal.App.4th at p. 863.) However, when the jury can draw no permissible inferences from gang-related evidence, the evidence can be sufficiently inflammatory to violate federal due process. In that case, the harmless error standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24, applies, and reversal is required unless the People can prove beyond a reasonable doubt that the error did not contribute to the verdict. (See *Huynh, supra*, 65 Cal.App.5th at pp. 985, 987; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.) We conclude that under either standard, the evidence of defendant's guilt was so strong that we are confident that the gang evidence, as minimal as it was, did not contribute to the verdict, nor would the result have been more favorable, had it been excluded.

Ultimately it was defendant himself who provided evidence to assure his conviction. The jury received evidence of numerous statements that defendant made in messages on Facebook, and by way of direct statements he made to witnesses such as Watkins and Acker, admitting culpability. As the prosecutor observed in closing argument, immediately after summarizing the gang evidence—which occupied slightly over one page of the reporter's transcript—"the defendant confesses in this case a lot." For example, in the November 20, 2017 message from defendant to Fraley that "I've had my own recent thing happen," defendant included a screenshot of the press release

19

regarding the murder followed by defendant's detailed description of why and how the murder occurred. In a message to Jarmen on the same date, defendant added a further detail that Lorenzo had a cigarette in his hand. By February 23, 2018, in a series of messages to Jarmen, defendant was again making statements admitting his involvement in Lorenzo's murder but now expressing concern that he would be discovered and disclosing that he was in possession of incriminating evidence. Watkins and Acker both testified that defendant told them directly and in person that he was responsible for the shooting.[6]

Where, as here, admissible evidence overwhelmingly establishes a defendant's guilt, error in admitting gang-related evidence is harmless under any standard. (*People v. Williams* (2009) 170 Cal.App.4th 587, 612-613 [error in admitting gang evidence harmless under *Watson*]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 293-294 [admission of gang-related evidence and gang expert testimony was harmless beyond a reasonable doubt]; see also *People v. Coneal, supra*, 41 Cal.App.5th at pp. 972-973; *People v. Beckley* (2010) 185 Cal.App.4th 509, 516-517; *People v. Davis* (1996) 42 Cal.App.4th 806, 813.)

---

[6] Defendant did little to rebut this evidence. His explanation for his multiple admissions in Facebook messages was that he was "talking crap" out of boredom while high on drugs. His response to the testimony of Watkins and Acker was simply to deny he ever said the incriminating statements they both related.

# DISPOSITION

The judgment is affirmed.

          /s/                  
EARL, J.

We concur:

      /s/            
ROBIE, Acting P. J.

      /s/            
RENNER, J.